**TRADERS & GEN. INS. CO. v. FROZEN FOOD EXPRESS.**

**No. 10077.**

Court of Civil Appeals of Texas. Austin.

Jan. 21, 1953.

Rehearing Denied Feb. 18, 1953.

Thompson & Coe, Will C. Thompson, Vernon Coe, W. S. Barron, Jr., by Vernon Coe, all of Dallas, for appellant.

Phinney, Hallman, Reed & Holley, Carl L. Phinney, Leroy Hallman and Pat Reed, by Leroy Hallman, all of Dallas, for appellee.

HUGHES, Justice.

Traders and General Insurance Company, appellant, brought this suit against appellee, Frozen Food Express, a corporation, to recover premiums alleged to be due it under workmen's compensation insurance policies issued by appellant to appellee.

Premiums under such policies, generally speaking, are calculated on the remuneration paid employees of the insured.

Basically the issue here is whether certain truck drivers and their helpers are as a matter of fact employees of the insured or as a matter of law are to be considered as such employees by reason of application of section 6, Article 8307, V.A.C.S.

Appellee's defense to this suit is primarily that such truck drivers and their helpers were not its employees but were employees of an independent contractor and, in any event, appellant was estopped to contend otherwise.

Appellee's principal business is that of transporting frozen foods in trucks for others for compensation.

Such trucks are leased by appellee under written agreements which are in the following form:

"Frozen Food Express
Lease and Operating Agreement

"1.——————— (Name of Owner of Automotive Equipment), hereinafter termed the lessor, hereby leases and delivers complete possession and control to Frozen Food Express of the following equipment.

| "Truck or tractor | Semi-trailer |
|---|---|
| (Form requires de- | (Form requires |
| tailed descrip- | detailed des- |
| tion) | cription) |

"2. The term of said lease shall be continuous until cancelled by either party on five days written notice.

"3. Frozen Food Express agrees to pay the lessor for the use of the above equipment described above as follows:

"Basis of Compensation

"Basis: ————————————

"4. Lessor agrees to maintain said equipment in first class and safe operating condition and at lessor's expense procure all license and permit tags or plates required for the operation of equipment, and pay all taxes assessed against the equipment, pay all operating expenses, assume and indemnify Frozen Food Express against liability or expense for work done, materials or appliances used or purchased in discharge of lessor's covenants and loss or damage to the property of Frozen Food Express, or damage to any cargo being transported by lessor for Frozen Food Express that may result from defective equipment or the negligence of lessor.

"5. Lessor further agrees to observe all safety and other requirements of the Interstate Commerce Commission and all other regulatory bodies having jurisdiction and to pay all fines due to overload, overlength, over-weight, lack of permits and plates, speeding and other fines which may be assessed against him for his failure to live up to such rules and regulations of the Interstate Commerce Commission and other regulatory bodies having jurisdiction.

"6. It is further understood and agreed that while the foregoing equipment is under the direction and control of Frozen Food Express it shall be operated only by the lessor or his representatives while in the employ of Frozen Food Express, and lessor will haul no freight not authorized under the certificates and permits of Frozen Food Express.

"7. Frozen Food Express further agrees to procure liability and property damage and cargo insurance as required by law, but no fire, theft, or collision insurance on the equipment described above.

"8. In the event of the wreck of the vehicle or its inability expeditiously to continue operation with the load to destination, the parties agree that Frozen Food Express shall forward the load or any part thereof as may be necessary by any means or vehicle with the least possible delay, and shall deduct from any amount due lessor as provided above, the cost and expense thereof, except that Frozen Food Express shall not be entitled to reimbursement for services (other than transportation) in handling and salvaging damaged freight.

"9. In the event lessor hires a driver during the term of this lease, lessor agrees: (a) To furnish at his expense Workmen's Compensation Insurance to cover said driver;[1] (b) To pay all Social Security, Old Age Benefits and Unemployment Compensation taxes and assessments; (c) To pay all costs and expenses of operations, maintenance, and upkeep of said equipment, and that lessee shall not be liable for any such items; (d) That lessee shall not be liable for any loss or damage to

---

1. This agreement was not complied with insofar as this case is concerned.

or destruction of said leased equipment while it is being operated by or is in the care of said driver; (e) To idemnify lessee against any loss resulting from the injury or death of said driver; (f) To indemnify lessee against any loss or damage resulting from the negligence, incompetence or dishonesty of said driver.

"Date ———— Lessor ————
"Frozen Food Express (A Corporation)
"Address ————————
"Terminal —— Town —— State——
"By ———— Telephone ————"

Under such lease lessor received 70% and lessee 30% of the gross income of the trucks.

Concerning the operation of the business of Frozen Foods its President testified:

"A. Our operation is based on the handling of perishables, primarily low temperature perishables such as frozen foods, shrimp, fish, frozen meats, frozen eggs; and then we handle a lot of perishables over what we classify light refrigerator commodity nature, like cheese, fresh meats, oleomargarine, butter, items of that kind. We operate between primarily the Texas area on the one hand, and all of the states in the middle west on the other; secondarily between Texas on the one hand, and California on the other; and then to a lesser extent from Texas on one hand, to the Eastern Seaboard states on the other. We transport—now the standpoint of day-to-day operation, our operation is conducted in this manner: The shippers call us for movement of merchandise and we dispatch trucks, load it—it's loaded primarily at warehouse points, packing points, and goes primarily to warehouse points and packing points at the destination.

*    *    *    *    *    *

"Q. Now the Interstate Commerce Commission requires the driver and the equipment to be under the control of the person under whose permit they are carrying, does it not? A. The Interstate Commerce Commission requires that the equipment be under the control of the party who has the permit.

*    *    *    *    *    *

"Q. (By Mr. Coe) Now, the trucks which operated for you under such a lease agreement were to be operated exclusively for you, is that not correct, during the terms of the lease contract? A. They were exclusively under lease to Frozen Food Express, yes, sir.

"Q. And the only people for whom they were to haul, other than Frozen Food Express, were such persons as you might authorize them to haul for, during the term of that lease? By 'persons whom you might authorize them to haul for' I mean on through hauls you had associated companies who would take over the supervision and control of the equipment and the driver. A. We were operating under the authority of the Interstate Commerce Commission, and such hauls as we were authorized to make under that authority or in connection with that authority were the only hauls that they were authorized to make under that lease.

*    *    *    *    *    *

"Q. Now, as far as the permit to haul is concerned, that was your responsibility? A. That's correct, sir.

"Q. And these trucks all operated under your carrier's permit? A. That's correct, sir.

"Q. Now, with reference to fines, despite this provision in here you actually, as I understand it, had the men pay their speeding fines and violations of that sort, but for overloading you split that on the same basis as you did the commission? A. That's right, sir.

*    *    *    *    *    *

"Q. Now, all of these trucks operating under this type of agreement were required by you to have two operators, were they not? A. Yes, sir.

"Q. How do you term those, a driver and a helper, or were they both drivers, or what is your terminology for

them? A. Well, they are usually referred to as the operator and his swamper.

*   *   *   *   *   *

"Q. Now before a man could drive one of those trucks under your permit, and under one of these lease contracts, you uniformly required of them that they have a doctor's examination, did you not? A. That was required under the Interstate Commerce Commission rules and regulations, Mr. Coe, and we uniformly required it due to those regulations.

"Q. In other words, you required that yourself, of the driver, because the Interstate Commerce regulations required it of an operator under a carrier's permit such as you had? A. That's right.

"Q. Now, you also required them to make a log of their trip, did you not? A. That's right, sir.

"Q. And you required them to report to the branch office nearest them when they completed a load, did you not? In other words, when they completed delivery of a load, they were required to report to the nearest branch office, were they not? A. They weren't required to, but as a matter of practice it was—in other words, to be available to load their equipment why they would have to check in to the office notify them that they were ready.

"Q. All right. A. The term 're-quire' that you use there is the product of custom. In other words you couldn't load a piece of equipment until you knew it was ready to go, and you didn't know it was ready to go until you had information to that effect.

"Q. And they regularly did report promptly when they were ready to load, to the nearest branch office? A. That's right.

"Q. Now, you required them to comply with all the safety rules and regulations that are put out by the Interstate Commerce Commission, did you not? A. That's correct, sir.

"Q. And you posted a notice in your place of business that they should not exceed so many miles an hour speed limit, is that correct? A. Yes.

"Q. Now, did you have someone make safety inspections of the various equipment before it went out on a trip for you? A. We have recently. I don't remember the exact date that we started the practice on it. The Interstate Commerce Commission ran a check on our operation some time during the year 1950 and insisted that we require—in other words, before that time we had relied upon the drivers checking their equipment, and—

"Q. But you don't know when that change was made? A. That change was made then at the request of the Interstate Commerce Commission, that we make the check personally on the equipment.

"Q. You make that check then before and after a trip? A. Yes, sir.

"Q. Now you have made available for these truck drivers a group policy of insurance, have you not? A. Yes, sir.

"Q. That covers life, hospitalization, sickness and accident benefits, does it not? A. Yes, sir."

The jury made these findings:

1. Lessors of trucks to Frozen Foods were independent contractors and the drivers and drivers' helpers of such trucks were employees of independent contractors and were not employees of Frozen Foods.

2. That prior to the issuance of the insurance policies involved in this suit as well as on or about May 13 or 14, 1948, and on or about November 23, 1949, appellant or its agent knew it was the contention of Frozen Foods that such policies did not cover operators of trucks leased by it and that it did not desire compensation insurance coverage for such operators.

3. That appellant's agent was advised in October, 1948, by appellee that it would carry no more compensation insurance on truck drivers.

4. That it was not the intention of Frozen Foods to include drivers or swampers or leased trucks under the policies in question.

Judgment based on this verdict was that appellant take nothing.

█ It is our opinion that reversible error is reflected by appellant's seventh point which reads:

"The Court erred in admitting testimony over the objection of Plaintiff by the witness Cyrus B. Weller and by the witness Roy A. Langston that there were no claims paid by the Plaintiff Traders & General Insurance Company under the policies introduced as Plaintiff's Exhibits 1 and 2. (Germane to Assignments of Error numbered I and II and subdivisions thereunder.)"

In connection with point seven we also wish to discuss appellant's point six which reads:

"The Court erred in failing to admit testimony offered by Plaintiff to show that two operators of leased trucks while in the employ of Frozen Food Express under the same circumstances as the operators here in question, were killed and their beneficiaries recovered death benefits from the workmen's compensation carrier of frozen Food Express."

Appellant's approved bill of exceptions in this regard is as follows:

"Be it remembered that during the progress of the trial of this cause in the presence of the Jury and before the Court, Plaintiff Traders & General Insurance Company duly offered in evidence testimony as follows:

"A. Testimony of Cyrus B. Weller that Harold P. Slay, deceased, and W. L. Slay, deceased, were on or about the 12th day of September, 1950, operating trucks in the employ of Frozen Food Express under a lease contract, the trucks not being owned by Frozen Food Express, the lease contracts being of the same kind and character in so far as material to a determination of the issues in this cause as those evidenced by Plaintiff's Exhibit No. 3 herein, and that on said date or thereabouts, both of the aforenamed were killed. That the beneficiaries of each of the aforesaid deceased persons made claim against the then workmen's compensation insurance carrier of Frozen Food Express and that the then compensation carrier of Frozen Food Express, to-wit, Texas Indemnity Insurance Company, paid the death benefits prescribed by the Workmen's Compensation Act to the respective beneficiaries of Harold P. Slay, deceased, and W. L. Slay, deceased.

"B. Traders & General Insurance Company further offered in evidence exhibits attached hereto as P–23, P–24, P–25, offering each of them separately, and each instrument therein separately.

"The Court refused to admit any of the testimony or either of the aforesaid exhibits or any part thereof in evidence, ruling that they were immaterial and irrelevant to any issue on the cause.

II

"Thereafter Defendant was allowed to prove as the transcript of the testimony will reflect that no claims were paid by Traders & General Insurance Company under the policies of insurance introduced in evidence as Plaintiff's Exhibits 1 and 2. This proof when offered was objected to by Plaintiff as will be seen from the transcript.

III

"After the admission of the testimony referred to in the preceding paragraph, Plaintiff Traders & General Insurance Company again offered the same proof as is referred to in the paragraph hereof numbered I. The Court again refused to admit such testimony. The Court still held that it was immaterial and irrelevant and excluded it all from the record and from the jury."

Appellee's counterpoint to appellant's point seven is to the effect that such evidence was admissible to show the inter-

pretation of the parties of the contract of insurance; and its counterpoint to point six is to the effect that such testimony pertained to other parties and contracts not involved here and is irrelevant.

We agree with appellee as to point six but in so doing we feel the emphasis of the error reflected by point seven.

The evidence admitted by the court was certainly calculated to impress the jury with the lack of good faith in appellant's claim for additional premiums, since such claim was being prosecuted after cancellation of the policies and for the carrying of an alleged risk which had cost it nothing. The testimony was irrelevant but very prejudicial and the argument which counsel could make to the jury based on this evidence is easily imagined. It put appellant in the position of betting on a sure thing.

Losses paid by other companies under the same circumstances as we have here would likewise be irrelevant but such evidence would be very prejudicial to appellee's defense and the court properly excluded it.

We fail to understand how the fact that appellant paid no losses under this risk could possibly show a practical construction of the contract of insurance by the parties. Appellant had no control over the incidence of injuries, the circumstances under which they occurred or with the prosecution of any claims.

Furthermore we doubt that a contract such as this is within the rule of practical party construction because it is largely controlled by law and is affected by the public interest.

It is our opinion that the error of the court in admitting the evidence in question amounted to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case and for which this cause should be reversed and remanded.

■ In view of this holding it is proper that we pass upon other points raised which will likely be presented upon retrial.

■■ Appellant requested submission of the following special issues, submission of which was refused:

"1. 'Do you find from a preponderance of the evidence that Frozen Food Express entered into the lease contracts in evidence during the period from March 14, 1948, until February 20, 1950, with the purpose and intention of avoiding any liability imposed by the Workmen's Compensation Laws of this state? Answer "Yes" or "No".'

"2. 'Do you find from a preponderance of the evidence that Frozen Food Express entered into the lease contracts during the period from March 14, 1948, until February 20, 1950, with the purpose and intention of avoiding liability imposed by the Workmen's Compensation Laws of Texas to pay premiums for such Workmen's Compensation insurance? Answer "Yes" or "No".' "

Point four asserts this action of the court to be erroneous and point three asserts an affirmative answer to these issues was required by the undisputed evidence and hence its motion for an instructed verdict should have been granted.

Appellee's President testified:

"Question: Now during the course of the conversations that you have had with representatives of Traders & General Insurance Company who came out there to look at your books and discuss the amount of premium you owed under these workmen's compensation policies, do you remember, Mr. Weller, having told them that you were going to operate under this lease agreement for the purpose of avoiding the payment of premium on the policy because they had insisted upon your making this payment back in 1948 that you didn't think you should pay?

"Answer: I told them that that was one of the factors that I took into consideration in operating on the lease agreements."

It is undisputed that appellee's business which is transporting frozen foods is accomplished through the use of leased equipment.

385

In our opinion the evidence in this case required submission of one or both of the requested issues.

Section 6 of Art. 8307, supra, provides in part:

"If any subscriber to this law with the purpose and intention of avoiding any liability imposed by its terms sublets the whole or any part of the work to be performed or done by said subscriber to any sub-contractor, then in the event any employe of such sub-contractor sustains an injury in the course of his employment he shall be deemed to be and taken for all purposes of this law to be the employe of the subscriber, * * *."

In United States Fidelity & Guaranty Co. v. Hall, Tex.Civ.App., 224 S.W.2d 268, this Court after holding Hall's employer to be an independent contractor, held that the evidence was insufficient to support a jury finding under this statute. The Supreme Court granted a writ of error in that case, later dismissed on joint motion of the parties, on the point that there was evidence sufficient to support the jury finding. It is most unlikely that the Supreme Court would have granted the writ on this point unless it believed Section 6 included independent contractors.

The facts in the Hall case are fully set out in the opinion and will not be restated. We believe a comparison of that case with the facts here will disclose that the evidence here is equally as strong as there on this question. It is significant too that the application for the writ of error in the Hall case particularly directed the attention of the Court to the opinion in the case of Fort Worth Lloyds v. Mills, Tex.Civ.App., 213 S.W.2d 565 (writ ref., n.r.e.), which is the sole authority cited by appellee in answering these points. In that case one ground of the decision was that Section 6 of the statute, supra, did not apply to nor include independent contractors. If this emasculation of the statute is sound, then there is left no area within which Section 6 may function. A subcontractor must be either fish or fowl. He is either an employee, servant or agent of his principal or he is an independent contractor. If the application of Section 6 is limited to subcontractors who are "employees" of the principal then it is meaningless because employees of the principal do not need any protective statute.

We are also of the opinion that the finding of the jury that drivers, and their helpers, of the trucks were employees of an independent contractor is so against the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust and we are strongly inclined to the belief, but do not hold, that their status as employees of Frozen Foods is established as a matter of law. These questions are presented by appellant's second and ninth points.

The main facts pertinent to these points have been previously stated and will not be repeated.

The case most closely in point which we have been able to find is Texas Reciprocal Ins. Ass'n v. Latham, Tex.Civ.App., 72 S.W.2d 648 (Beaumont error dism.). The following facts are taken from that opinion:

"For some time before, and at the time of, appellee's injuries, Tibbetts & Tibbetts Construction Company was engaged in construcing a pipe line for the Texas Company from near Shreveport, La., to a point in Shelby county, Tex. A Mr. Harman was general foreman in charge of the work. The truck which appellee was driving at the time of his injury was owned by H. J. Maxwell of Center. Mr. Maxwell testified that he employed appellee, Latham, as a truck driver and that Latham had worked for him in that capacity for about five years prior to the injury, his wage being $3 per day; that about a week or so before the injury he (Maxwell) made a contract with Tibbetts & Tibbetts Construction Company, through its foreman, Mr. Harman, to furnish it a truck and driver to be used in hauling pipe, the company to pay him $1.25 per hour as hire for the truck and driver; that in accordance with the contract he sent appellee, Latham, with the truck to Keatchie, La., where the construction work was

386

*in* progress, and from then up to the time of the injury Latham hauled pipe on the truck for Tibbetts & Tibbetts Construction Company, for which the company paid him (Maxwell) the agreed hire of $1.25 per hour for the use of the truck and driver. Mr. Maxwell paid appellee, as driver of the truck, the $3 per day for his services. Mr. Maxwell testified that under his contract with Tibbetts & Tibbetts Construction Company he had nothing to do with directing the work of Latham; that Latham was under the direction and control of the foreman, Harman, who supervised his work, directed him where to go, where to load, how much load to put on, and how to operaate the truck; * * *."

The Court held this evidence sufficient to show that Latham was an employee of Tibbetts & Tibbetts Construction Company as it had the right to direct and control the work which Latham was to perform, it being immaterial that Latham was paid by Maxwell.

See Cobb v. Harrington, 144 Tex. 360, 190 S.W.2d 709, 172 A.L.R. 837, where it is held that one who leases trucks, with drivers, to motor carriers under leases very similar to the ones involved here is not himself a motor carrier, but his lessees are.

The drivers and helpers of these trucks while they may be in the formal employment of the lessors are actually engaged in the only business which Frozen Foods conducts, the transportation business.

■ It also would seem that leased drivers are the equivalent of borrowed drivers within the rule that:

"Where one person lends his servant to another for a particular employment and such servant becomes subject to the direction and control of the person to whom he is lent, for anything done in that particular employment he must be dealt with as a servant of the person to whom he is lent, although he remains the general servant of the person who lent him." Maryland Casualty Co. v.

Donnelly, Tex.Civ.App., 50 S.W.2d 388, 390 (Waco, error dism.).

See also Humble Oil and Refining Co. v. Martin, 148 Tex. 175, 222 S.W.2d 995, to the effect that a third party is not concluded by the terms of a written contract in determining whether one is an employee or an independent contractor.

■ We also sustain appellant's fifth point to the effect that jury findings on issues relating to waiver and estoppel do not support a judgment for appellee.

The establishment of premium rates for workmen's compensation insurance is exclusively vested in the Board of Insurance Commissioners, Arts. 5.55, 5.56 and 5.57 V.A.T.S., Texas Insurance Code. The rates promulgated by the Board are not subject to alteration by the parties by agreement, estoppel, waiver or otherwise. Texas Employers' Insurance Association v. Russell, 127 Tex. 230, 91 S.W.2d 317; Houston & T. C. R. Co. v. Johnson, Tex.Com.App., 41 S.W.2d 14, 83 A.L.R. 241; Brown & Root, Inc. v. Traders & General Ins. Co., Tex. Civ.App., 135 S.W.2d 534 (Gal., error dism. cor. judgm.); Continental Fire and Casualty Ins. Corp. v. American Mfg. Co., Tex. Civ.App., 221 S.W.2d 1006 (Fort Worth, error ref.).

We recognize that the opinion in Zurich General Accident & Liability Ins. Co. v. Fort Worth Laundry Co., Tex.Civ.App., 63 S.W.2d 236, by the Fort Worth Court of Civil Appeals is not in harmony with the cases just cited and with many other similar cases which could be cited.

Appellant's eighth point complains of the form of Special Issues 1 and 2 and the order in which 1, 2 and 3 were submitted.

Special Issues 1, 2 and 3 and accompanying definitions are:

"You are instructed that by the term 'independent contractor,' as used in this charge is meant any person who, in the pursuit of individual business, undertakes to do a specific piece of work for other persons using his own means and methods without submitting himself to their right of control in respect to its material details, and who represents

the will of his employer only as to the result of his work and not as to the means to which it is accomplished.

"Special Issue No. 1:

"In the light of the definition of an 'independent contractor,' you will answer the following: Do you find from a preponderance of the evidence that the lessors of the trucks which were leased to the Frozen Food Express were independent contractors?

"Answer 'Yes' or 'No.'

"Answer: Yes. ·

"Special Issue No. 2:

"In the light of the foregoing definition of an 'independent contractor,' do you find from a preponderance of the evidence that where the drivers and swampers operating the leased trucks were not the owners of the leased trucks, such drivers and swampers were employees of independent contractors?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"By the term 'employee' as used herein, is meant every person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power and right to control and direct the employee in the material details as to how the work is to be performed.

"Special Issue No. 3:

"In the light of the above definition of 'employee,' do you find from a preponderance of the evidence that the operators and swampers operating the leased equipment herein were employees of the defendant, as that term is hereinabove defined, during the period of their employment between the dates of March 14, 1948, and February 20, 1950, inclusive?

"Answer 'Yes' or 'No.'

"Answer: No."

■ There is no arbitrary rule governing the order in which issues shall be submitted. 41 Tex.Jur. p. 1088.

■ Appellant's objection to special issue number one is that it includes truck owners who were nonoperators and as to whom no contention was made that they were employees of Frozen Foods. This seems a valid objection.

■ The objection to issue number 2 is that in connection therewith the court did not instruct the jury on the law of borrowed employees. Such an instruction should be given if properly requested on retrial.

■ The last point to be considered is appellant's first point which complains of the trial court's refusal to grant its motion for instructed verdict on the ground that its right to recover is conclusively controlled by the following provisions of the Texas Compensation Manual, promulgated by the Board of Insurance Commissioners, as applied to the undisputed facts:

"(e) Chauffeurs and their helpers are defined as those employees whose principal duties are performed upon or in connection with motor vehicles in either capacity, and shall also include incidental garage employees or employees using bicycles in the service of the employer.

"If motor vehicles, including chauffeurs and helpers, are employed under contract and if the owner of such motor vehicles has not insured his compensation obligation and furnished evidence of such insurance, the actual payroll of the chauffeurs and helpers shall be included in the payroll of the insured employer at the proper rate for the operations in which they are engaged. If such payroll cannot be obtained, one-half ($\frac{1}{2}$) of the total amount paid for the hire of such motor vehicles under contract shall be considered as the payroll of the chauffeurs and helpers."

The Supreme Court has held that the Workmen's Compensation Act extends benefits only to employees and excludes independent contractors. Texas Employers' Ins. Ass'n v. Inge, 146 Tex. 347, 208 S.W. 2d 867.[2] The Board has no authority to enlarge upon these statutes.

2. Section 6 of Art. 8307 was not involved.

It is our opinion that the above rule must be considered in connection with the Workmen's Compensation statutes and that it applies only if the chauffeurs and helpers are employees under such statutes, including Section 6 of Art. 8307.

The judgment of the trial court is reversed and this cause is remanded for a new trial.

Reversed and remanded.

ARCHER, C. J., dissenting in part.

ARCHER, Chief Justice (dissenting in part).

I concur in a reversal of this case because of what I believe to be an error in the submission of special issues Nos. 4, 5, 6, 7, 8 and 9 pertaining to the question of waiver of premiums.

When the Board of Insurance Commissioners prescribes a rate, the insurer and/or the insured cannot adopt a different one. English Freight Co. v. Knox, Tex.Civ. App.1944, 180 S.W.2d 633, error ref.

Then too, it was error for the court to admit testimony that no claims had been paid by the insurer because the fact that no claims had been paid based on established losses would in nowise absolve the insurer of its liability for such losses and likewise would not relieve the insured from its obligation to pay premiums.

I do not believe that the drivers of the pieces of leased equipment used by the appellee were as a matter of law employees of Frozen Food Express while operating such leased equipment.

The contracts provided the terms and conditions thereof and are set out in the opinion in this case.

Whether one is an employee or an independent contractor would depend upon the terms of the contract, and since a person employed to do work for another is either an employee of such person or an independent contractor, the employee is covered by the Act but an independent contractor is not. And I believe that the jury had evidence before it to support its verdict that the drivers in question were not employees of Frozen Food Express while operating such leased equipment, but that they were either independent contractors or where the driver did not own the equipment, employees of such independent contractor.

The Texas Workmen's Compensation Law, Article 8306, et seq., V.A.C.S., applies to employer-employee relationships only, and not to employment of an independent contractor.

The Court, in Williams v. Texas Employers' Insurance Association, Tex.Civ. App.1948, 218 S.W.2d 482, 485, error ref. n. r. e. stated:

"A person employed to do work for another is either an employee of such person or an independent contractor. An employee is covered by the Workmen's Compensation Act, art. 8306 et seq., Vernon's Ann.Civ.Stats., and an independent contractor is not."

Security Union Casualty Co. v. M. & V. Tank Co., Tex.Civ.App., 1928, 12 S.W.2d 1062. R. E. Cox Dry Goods Co. v. Kellog, Tex.Civ.App., 145 S.W.2d 675, error ref.

The appellant makes the contention that the Board of Insurance Commissioners may, by its rule, call all persons who are doing work for a subscriber "employees," and render the subscriber liable to pay for compensation on such persons even though the subscriber has no liability to such persons under the Act.

I do not sustain this contention. The statute provides who are covered by the Act, and the Board may not by its rules extend the Act to cover independent contractors, if it desired to do so.

I do not believe that the undisputed evidence shows that the insured sublet the whole or principal part of the work which it was contemplated was to be performed with the purpose and intention of avoiding liability imposed by the terms of the Act.

The contracts provide for maintenance and operation of the equipment by the lessor, purchase of license plates, etc., pay operating expense of his equipment, provide indemnification in favor of Frozen Food Express against loss or damage, and if the equipment owner hired a driver for his truck, he agreed to pay any workmen's

compensation insurance and social security taxes on such driver.

The lessee paid the lessor seventy per cent of the gross charge for the movement.

During the term of the lease the equipment was exclusively to be used in the service of lessee.

The pleadings and the evidence raised the fact issue for the jury to decide, as to whether the operators were employees of appellee or independent contractors.

I believe the findings of the jury are reasonably supported by the evidence. The contracts by their terms were before the jury as well as was the testimony of Cyrus B. Weller, President of Frozen Food Express, and of witnesses Perry, Kidd, and Yale, who were witnesses for the appellant.

There is no testimony that Frozen Food Express sublet any work, but the several equipment owners as lessors were paid seventy per cent of the gross charge for the movement. Fort Worth Lloyds v. Mills, Tex.Civ.App.1948, 213 S.W.2d 565, error ref. n. r. e.; Texas Employers Ins. Ass'n v. Harper, Tex.Civ.App., Dallas, 1952, 249 S.W.2d 677, error ref., n. r. e.

The fact that our Supreme Court granted a writ in the Hall case is not of itself a positive assertion by the Court that it would have reversed the case and restated the law with reference to Section 6, but the Court may have not been satisfied with the way and manner in which the Hall case was disposed of by this Court and simply wanted to consider the matter.

I believe that the issues submitted Nos. 1, 2, and 3, inquiring if the lessors of the trucks were independent contractors and/or if the drivers and swampers operating the leased trucks were not the owners of said trucks, were employees of independent contractors, together with a definition of the term "employee," and inquiring if said operators and swampers were employees of the defendant during a period between March 14, 1948 and February 20, 1950, inclusive, the first two issues were answered "Yes" and the third was answered "No," raised the issues and the jury's verdict is reasonably supported by the evidence, and the court properly overruled plaintiff's motion to set aside the verdict of the jury on the ground that the answers of the jury are so contrary to the overwhelming weight of the evidence as to show passion and prejudice.

But for the submission of special issues Nos. 4, 5, 6, 7, 8 and 9, of itself not sufficient to reverse the case, but taken with the probable and its attendant effect upon the jury, and the admission of testimony that no losses had been paid, I would affirm the trial court's judgment.

I therefore concur in the reversal of this case, but do not concur in the entire opinion of my associates.